IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:19-cr-112 (LO) |
| | ) | |
| SPENCER PAK | ) | |
| | | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:19-mj-125 |
| | ) | |
| ZU HUN CHANG | ) | |

**MOTION OF THE UNITED STATES
TO RESOLVE ATTORNEY CONFLICT**

The United States, by and through the undersigned counsel, hereby moves this Court to address and resolve the conflict of interest inherent in the representation by defense counsel of two defendants in the same investigation.  Spencer Pak has been charged by indictment in No. 1:19-cr-112 and is represented in that case by Alan Cilman.  Defendant Pak is scheduled for arraignment on April 19, 2019.  Zu Hun Chang has been charged by criminal complaint in No. 1:19-cr-125.  Defendant Chang had his first appearance on April 15, 2019, and he has a preliminary/detention hearing scheduled for April 17, 2019, before Judge Anderson.  Mr. Cilman represented defendant Chang in state court proceedings on related charges and, we believe, intends on representing defendant Chang on his federal charge.  As discussed below, defendants Pak and Chang are part of the same gang, they have communicated with each other and with other members of the gang, and they have intimate, first-hand knowledge of the gang's origins,

structure, membership, and criminal activities. As such, Mr. Cilman cannot provide adequate, conflict-free representation for either client.

## BACKGROUND

The FBI, other federal law enforcement agencies, and local law enforcement agencies have been investigating narcotics trafficking and other criminal activity by members of a criminal street gang called the Reccless Tigers and by persons associated with this gang. This criminal activity has occurred primarily in the Prince William County, Fairfax County, and Loudoun County areas of Northern Virginia.

As a result of this investigation, on February 15, 2019, criminal complaints were issued in the Eastern District of Virginia in two cases. In No. 1:19-mj-90, the United States charged Spencer Pak, Ha Lim Chung, Grace Catherine Reilly, and Brandon Sobotta with conspiracy to distribute 500 grams or more of cocaine, in violation of Title 21, United States Code, Sections 841 and 846. A grand jury returned an indictment on April 4, 2019 (No. 1:19-cr-112 (LO)), charging Spencer Pak and Brandon Sobotta with conspiracy to distribute cocaine and marijuana, in violation of Title 21, United States Code, Sections 841 and 846. In No. 1:19-mj-91, the United States charged Peter Le, Dane Nicholas Hughes, and Anthony Nguyen Thanh Le with conspiracy to distribute cocaine, in violation of Title 21, United States Code, Sections 841 and 846. On February 21, 2019, a grand jury returned an indictment in *United States v. Peter Le et al.*, No. 1:19-cr-57 (LO) charging Peter Le, Dane Nicholas Hughes, and Anthony Nguyen Thanh Le with conspiracy to distribute cocaine and 100 kilograms or more of marijuana, in violation of Title 21, United States Code, Sections 841 and 846. A superseding indictment was returned in that case on April 11, 2019, charging an additional defendant, Angel Hoang, with conspiracy and Peter Le, Dane Nicholas Hughes, and Angel Hoang with additional counts of maintaining drug-involved premises, in violation of Title 21, United States Code, Section 856. In No. 1:19-mj-126, the United States charged Bradley William Sullivan with conspiracy to distribute 100 kilograms or more of marijuana, in violation of Title 21, United States Code, Sections 841 and 846. In No. 1:19-mj-125, the

United States charged Zu Hun Chang, a/k/a Monster, with conspiracy to distribute 500 grams or more of cocaine, in violation of Title 21, United States Code, Sections 841 and 846. All of the charged defendants in these cases are members of, or otherwise associated with, the Reccless Tigers.[1] Of the defendants charged, Spencer Pak, Grace Catherine Reilly, Ha Lim Chung, Brandon Sobotta, Peter Le, Dane Nicholas Hughes, Angel Hoang, Bradley Sullivan, and Zu Hun Chang have been arrested. Anthony Nguyen Thanh Le is a fugitive.

Through interviews with witnesses and victims; the use of confidential sources; law enforcement actions (such as controlled purchases of narcotics); and the examination of telephone records (including GPS data), social media accounts, financial data, and other information, the investigating agencies have been able to identify dozens of Reccless Tigers and persons associated with them. They have also been able to link the Reccless Tigers to the commission of numerous crimes in Northern Virginia, including drug distribution, fire bombings, suspected homicides, malicious woundings, stabbings, robberies, burglaries, random shootings, firearms possession and trafficking, witness and victim intimidation and tampering, obstruction of justice, and money laundering.

The primary source of revenue for the Reccless Tigers is drug distribution. Members and associates of the Reccless Tigers distribute cocaine, heroin, prescription drugs, marijuana, vape pens, THC oils, and THC edibles.[2] Marijuana and THC products appear to be the most profitable drug

---

[1] As discussed herein, the Reccless Tigers includes predecessor and affiliate gangs such as the Asian Boyz (a/k/a ABZ), Young Korean Loks (a/k/a YKS), Korean Dragon Crew (a/k/a KDC), Sons of Gong (a/k/a SOG), Club Tiger, Tiger Side, and Lady Tigers (a/k/a Lady Ts).

[2] Marijuana is consumed in many different ways. Although smoking raw plant material is the most common form of consumption, many users consume THC (the primary psychoactive ingredient of marijuana) through a wide variety of alternative products extracted from the marijuana plant. These products (distillates and oils), contain highly concentrated amounts of THC. Compared to marijuana in raw plant form, these concentrated distillates and oils offer a more potent high, quicker onset of action, and a wider range of consumption methods.

Vape pens are a type of vaporizer designed specifically to vaporize marijuana distillates and oils. They are called pens because the design of the vape device closely resembles that of a traditional pen. A vape pen consists of two pieces: a battery and cartridge. Vape cartridges contain a mouthpiece, chamber and heating element, which is activated upon contact with a vape battery. The chamber of a vape cartridge is filled with some type THC oil or distillate.

trafficking activity for the Reccless Tigers. For example, financial records for one suspected member of the Reccless Tigers show proceeds from his suspected marijuana sales in excess of $1.5 million over a period of two years. A source of information stated that he sold over $400,000 worth of marijuana obtained from the Reccless Tigers and, specifically, from Peter Le. One of the defendants arrested in this case had in his possession over $23,000 in cash. He also deposited and withdrew from various financial institutions over $300,000 in the past several years.

The Reccless Tigers and their associates operate websites and social media platforms that openly promote and advertise marijuana sales. For example, the FBI has identified an Instagram account named Clubtiger.hustle as belonging to Peter Le. In the summer of 2018, FBI agents have seen photographs and videos of marijuana and cash on that Instagram account as well as clothing and other Reccless Tigers merchandise. The Peter Le account also included links to other Reccless Tigers Instagram accounts, and on those other accounts there were photographs of marijuana and offers of free marijuana.

The Reccless Tigers have adopted many traditional gang customs and rules. Gang members go through an initiation process and are "jumped in" when they are invited to join the gang. This involves being beaten by a number of other gang members. Investigators have obtained videos of gang members being jumped in. Gang members are also expected to participate when something "goes down." If the gang gets into a fight with a rival gang or drug crew, gang members are expected to participate in the fight on behalf of the gang. If a gang member does not participate, then that member will be "checked" later. Gang members are also expected to go on "missions," such as retaliatory assaults and fire bombings.

The Reccless Tigers have communicated to gang members and their associates that they will engage in multiple degrees of violent retribution against anyone for disrespecting other gang members (including cooperating (snitching) against gang members with authorities), stealing from the gang, or incurring debts to higher level gang members (typically drug debts). The initial level of violence often

---

Edibles are another common consumption method. Edibles are food products containing raw marijuana or concentrated THC oils or distillates. Popular forms of edibles include drinks, baked goods, and candies.

4

involves burglary or vandalism of property belonging to the offending member or gang associate or even his family. Another level of violence involves the physical assault of the offending member. These assaults have sometimes occurred in public. Another level of violence involves attempts to burn down the home and/or vehicle of the offending member or gang associate. Over the course of this investigation, the FBI and local authorities identified 12 such fire bombings of personal residences of the offending gang member or associate or of their families. The final level of violence involves killing a gang member or associate. By promising and carrying out these acts of violence, the Reccless Tigers instill discipline and fear within the gang and gain valuable "street credit" when dealing with other criminal street gangs and organizations.

One aspect of this ongoing investigation involves two homicides linked to the Reccless Tigers. The first occurred in April 2016 at a party hosted by the Reccless Tigers. During that party, a victim was stabbed, and he died the following day. A second suspected homicide occurred recently. Brandon White was abducted on January 31 and into the early morning hours of February 1, 2019, by members of the Reccless Tigers. White had incurred a substantial drug debt to one of the Reccless Tigers. On August 8, 2018, David Nguyen severely beat Brandon White because of this debt. Nguyen was arrested and charged with this assault. White was subpoenaed to testify against Nguyen at Nguyen's preliminary hearing in Fairfax County Circuit Court. Prior to his court appearance, White was threatened multiple times and told that if he testified against Nguyen he would be killed. On November 19, 2018, White testified at the preliminary hearing and identified David Nguyen as the person who had attacked him in August. On January 31, 2019, White was lured to Loehmann's Plaza in Falls Church, Virginia, believing he was headed to Washington, D.C. to obtain some prescription pills. White was forced into a car in the parking lot and has not been heard from or seen again. He is presumed dead.

**DISCUSSION**

The Sixth Amendment guarantees a criminal defendant a "fair opportunity" to retain counsel of his own choosing. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006); *Sampley v. Attorney Gen. of N.C.*, 786 F.2d 610, 612-13 (4th Cir. 1986). That right, however, "is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Two well-established limitations are applicable here. First, a defendant's selection of counsel "may be overcome by a showing of an actual conflict of interest or the serious potential for a conflict of interest." *United States v. Fowler*, 491 F. App'x 453, 455 (4th Cir. 2012). Second, a defendant's selection of counsel is limited by "the countervailing state interest . . . in proceeding with prosecutions on an orderly and expeditious basis." *Sampley*, 786 F.2d at 613.

**I.      Mr. Cilman's Representation of Defendant Pak and Defendant Chang Presents a Conflict of Interest.**

The Sixth Amendment provides criminal defendants with the "right to effective assistance [of counsel] free of conflicts of interest." *Hoffman v. Leeke*, 903 F.2d 280, 285 (4th Cir. 1990). "In some cases, a defendant may make a knowing and voluntary waiver of his right to conflict-free counsel." *United States v. Cortez*, 205 F. Supp. 3d 768, 780 (E.D. Va. 2016). But "not all conflicts may be waived." *United States v. Dalton*, 442 F. App'x 898, 901 (4th Cir. 2011). Even when a defendant seeks to waive a conflict, the Court may nevertheless disqualify the attorney based on its "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988).

The Court has "a duty to anticipate problems with representation and to promptly act to remedy a potential conflict." *Dalton*, 442 F. App'x at 901. The government is encouraged (if not required) to raise any such conflict of which it is aware. *See Cortez*, 205 F. Supp. 3d at 775.

"Once a conflict or potential conflict is identified, the [C]ourt is obligated and has discretion to independently determine whether the continued representation by counsel impedes the integrity of the proceedings and whether the attorney should therefore be disqualified." *Fowler*, 491 F. App'x at 455.

In making this determination, the Court enjoys broad discretion. The Supreme Court has recognized that trial courts "must pass on the issue . . . not with the wisdom of hindsight . . . but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly." *Wheat*, 486 U.S. at 162. "The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." *Id.* at 162-63. Given the difficulties in foreseeing the development of conflicts of interest, trial courts have "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict." *Id.* In short, "[t]he presumption in favor of a counsel of one's choosing may be overcome by a showing of an actual conflict of interest or the serious potential for a conflict of interest." *Dalton*, 442 F. App'x at 901.

The United States submits that Mr. Cilman has an irreconcilable conflict of interest in representing defendant Pak and defendant Chang. In fact, Mr. Cilman had a conflict of interest in representing defendant Pak based on his prior representation of Chang in state court proceedings. The United States also contends that, even if all affected parties would agree to waive the conflict, the Court, the government, and the defendants cannot possibly foresee all

possible future conflicts as they may arise as the investigation proceeds, thus making it impossible for the Court to discern whether such waivers were knowing.

The Fourth Circuit has recognized that "[a]n attorney has an actual conflict when he actively represents conflicting interests." *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991). "An actual conflict of interest 'occurs in circumstances where a lawyer's interests are such that it is reasonable to believe that she or he would be tempted to act in a manner inimical to the client's best interests.'" *Cortez*, 205 F. Supp. 3d at 776 (quoting *Reckmeyer v. United States*, 709 F. Supp. 680, 688 (E.D. Va. 1989)). Similarly, under the Virginia Rules of Professional Conduct,[3] "[a] concurrent conflict of interest exists if . . . there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person." Va. Rules of Prof'l Conduct R. 1.17(a)(2). "Loyalty to a client is . . . impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests." *Id.* cmt. 8.

A conflict of interest arises when a defense attorney's representation of another client precludes him from exploring plea negotiations on behalf of the defendant. *See Holloway v. Arkansas*, 435 U.S. 475, 490 (1978); *Tatum*, 943 F.2d at 376. As the Supreme Court has recognized in another context, "[t]he reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires." *Missouri v. Frye*, 566 U.S. 134, 143 (2012).

---

[3] The United States cites to the Virginia Rules of Professional Conduct because they govern "the ethical standards relating to the practice of law in criminal cases in this Court." Local Criminal Rule 57.4(I).

Exploring plea negotiations is a critical component to providing adequate representation, since a plea deal can materially benefit a defendant. *See Tatum*, 943 F.2d at 376. A conflict that impairs an attorney's ability to explore "a plea bargain that would minimize potential jail time in return for cooperation" can support disqualification of that attorney. *United States v. Balsirov*, No. 1:04CR421, 2005 WL 1185810, at *4 (E.D. Va. May 18, 2005) (emphasizing "the serious potential for a conflict to arise pre-trial in the course of plea bargaining" in disqualifying counsel from jointly representing two defendants charged in the same case); *see also United States v. Roman*, Cr. A. No. 94-00017-C, 1994 WL 723066, at *2 (W.D. Va. Dec. 19, 1994) ("Most problematic, the attorney will not even be in the position to advise a client that cooperation with the Government may be the best alternative, since such advice will likely be adverse to the attorney's other clients in the conspiracy.").

Mr. Cilman's representation of both Pak and Chang presents a significant risk that he cannot provide adequate assistance to those defendants in advising and counseling them through the plea process. The United States has informed Mr. Cilman that Pak and Chang are members of the same gang (*i.e.*, the same conspiracy and/or racketeering organization). Pak was arrested following a number of undercover cocaine transactions. His charges also include conspiracy to distribute marijuana. Chang was arrested recently in possession of distributable quantities of cocaine and marijuana. His prior charges were for marijuana distribution. The government has provided counsel with photographs of the two defendants together. While these photographs, obtained from defendant Pak's social media account, do not, on their face, reveal jointly

undertaken criminal activity, they do demonstrate that the two defendants know and socialize with each other.

The government has considerable additional evidence showing both defendants' affiliation with the Reccless Tigers. Some of that evidence is summarized in the affidavit submitted in support of the criminal complaint charging Chang. Defendant Pak, for example, has posted numerous photographs on social media (Snapchat) of products with Reccless Tiger brands (*e.g.*, Clubtiger.hustle). Significantly, numerous cooperating witnesses have identified both Pak and Chang as being affiliated with the Reccless Tigers (including their affiliation with predecessor gangs the Young Korean Loks and Korean Dragon Crew).

Whether Pak and Chang have been involved personally in the same charged drug transactions is not dispositive of the conflict issue. Pak's and Chang's association with the gang, their knowledge of gang membership and activities, other gang-related criminal activities, the gang's sources of drugs, etc. are all matters that are relevant to this investigation, to the current charges facing each defendant, and to any additional charges that may be brought against each defendant. For example, given the expanding number of cooperating individuals in this investigation, it is likely that the government may bring broader drug conspiracy charges against either or both defendants. Racketeering charges are also a real possibility, particularly as it relates to the suspected murders identified above.

Current counsel simply cannot provide objective, independent advice on whether Pak or Chang should plead guilty and cooperate with the government. Counsel cannot objectively advise defendant Pak or defendant Chang to plead guilty without risking that counsel creates damaging information and a potential witness against his other client. If defendant Pak, for example, were to plead guilty, Mr. Cilman should be actively attempting to persuade the

government to use him as a witness against his other client, Chang, which, of course, would be inimical to Chang's interests. The same situation arises if Chang were to plead guilty. *See Cortez*, 205 F. Supp. 3d at 778 ("[T]he conflict of interest is readily apparent: as counsel for Funk, Defense Counsel should attempt to persuade the prosecution to call Funk against defendant, so that Funk may receive a reduced sentence pursuant to Rule 35, Fed. R. Crim. P.; at the same time, as counsel for [the defendant], Defense Counsel should seek to exclude, diminish, or discredit Funk's testimony—which would undermine Funk's efforts to reduce his sentence.").

The conflict issue is not resolved should one or both defendants choose to go to trial. Counsel obviously cannot cross-examine a client (or former client) if that situation were to arise. In any trial situation involving members of the Reccless Tigers, counsel would have to evaluate whether a particular trial strategy would compromise the interests of one or the other client. Counsel, for example, would be forced to decide whether information gleaned from his attorney-client communications with one client can be used at trial to the detriment of the other client.

The government acknowledges that it has considerably more information about the gang and its criminal activities and the overlap between these two defendants than what has been provided to defense counsel. The government has not provided defense counsel with this information because it is discoverable with regard to the current charges facing each defendant. In addition, until this conflict is resolved, the government is reluctant to share sensitive information about cooperating individuals with counsel, not knowing whom counsel may end of representing in this case, if anyone, and with whom that information would be shared.

11

## II. Obtaining Waivers Will Not Resolve the Conflict Issue.

A defendant's waiver of his right to conflict-free counsel must be voluntary, knowing, and intelligent. *See Hoffman*, 903 F.2d at 288. "A waiver is voluntary if it is 'an intentional relinquishment or abandonment' of the right to conflict-free counsel." *Cortez*, 205 F. Supp. 3d at 780 (quoting *Hoffman*, 903 F.2d at 288). For a waiver to be knowing and intelligent, the defendant must have "knowledge of the crux of the conflict *and* an understanding of its implications." *United States v. Brown*, 202 F.3d 691, 698 (4th Cir. 2000).

Further, the Court should not accept any conflict waiver unless all affected parties waive the conflict. As noted, the Court has an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160. It is a fundamental rule of legal ethics that an attorney must obtain informed consent from *both* clients (or both the client and the prospective client) waiving a conflict of interest. *See* Va. Rules of Prof'l Conduct R. 1.17(b); Va. Rules of Prof'l Conduct R. 1.18(d)(1). The Court should therefore require that each affected party waive the conflict of interest to ensure that this criminal trial is conducted within the ethical standards of the profession.

Given how high the stakes are in these cases and the likelihood of post-conviction litigation challenging the Court's ruling, the Court should take precautions to ensure that any waivers are knowing, voluntary, and intelligent. In particular, the Court should do the following for each affected party:

> (i) forthrightly advise each affected client of the right to effective representation and of the potential dangers of representation by conflicted counsel; (ii) ensure that each affected client understands that right and those perils; (iii) grant each affected client the liberty to ask questions regarding the nature and consequences of his legal representation; (iv) ascertain whether each affected client has discussed the matter with his attorney, or whether he wishes to consult outside

> counsel; (v) endeavor to have each affected client personally articulate in detail his intent to waive his right to conflict-free counsel; and (vi) record the waiver colloquy.

*Cortez*, 205 F. Supp. 3d at 780. In addition, the Court should require all affected parties to be advised by conflict-free counsel to ensure that they receive independent advice on the issues. *See id.* at 781 (appointing independent counsel to "advise [a former client] prior to and during *voir dire* concerning [his] waiver"); Order 4, *United States v. Livingston*, No. 1:15-cr-201-LO (E.D. Va. Jan. 27, 2016) (appointing "independent counsel for the purpose of exploring the potential conflict of interest").

The United States submits that any waivers obtained today would not be adequate to protect against conflicts that are likely to arise in the future. As the investigation proceeds, more targets will be arrested and more cooperating witnesses will come forward. Additional searches of cell phones and social media accounts will also reveal additional evidence of the gang's activities. As new evidence is developed, the conflict issue discussed above would have to be evaluated, the government would have to advise defense counsel and the Court as to how this affects counsel's representation of Pak and/or Chang, and the Court would have to obtain additional waivers from the affected parties. At any point, Pak or Chang may decide not to waive the conflict, and new counsel would have to be obtained. That scenario could play out next week, next month, a day before trial, or in the middle of a trial. As a result, we submit that the Court cannot take the risk that waivers, obtained today, will not be sufficient to protect each of these defendant's Sixth Amendment rights in the future.

A defendant's choice of counsel "must not obstruct orderly judicial procedure and deprive courts of the exercise of their inherent power to control the administration of justice." *United States v. Gallop*, 838 F.2d 105, 108 (4th Cir. 1988)*, abrogated on other grounds by*

*Fields v. Murray*, 49 F.3d 1024 (4th Cir. 1995) (en banc). The Court has "wide latitude in limiting a defendant's right to counsel of choice based upon fairness and the demands of the court's calendar." *United States v. Jones*, 408 F. App'x 748, 751 (4th Cir. 2011). "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). Here, the Court should exercise its discretion to preclude Mr. Cilman from representing defendants Pak and Chang because of the possible prejudicial delay that his representation would cause in this case.

## CONCLUSION

For the foregoing reasons, the Court should conduct a hearing to determine whether Mr. Cilman should be disqualified from representing defendants Pak and Chang in these proceedings.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:       /s/
James L. Trump
Assistant United States Attorneys
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3726
Facsimile (703) 299-3980
Email: jim.trump@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of April, 2019, I caused the foregoing document to be sent to Alan Cilman at acilman@aol.com.

/s/
James L. Trump
Assistant United States Attorney